**STRICTLY CONFIDENTIAL:**
**FOR ATTORNEY-CLIENT, UNITED STATES ATTORNEY,**
**ATTORNEY GENERAL OF THE UNITED STATES,**
**AND STATE ATTORNEY GENERALS EYES ONLY**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

**UNITED STATES OF AMERICA**
**and THE STATE OF CONNECTICUT,**
*ex rel* **KIMBERLY HOWLAND,**

**Plaintiff-Relator**

**vs.**                                                   **March 26, 2014**

**PRIMED, LLC, PRIMED LLC ACO,**
**MED3000, and MCKESSON,**

**Defendants.**

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................... 1

II.     JURISDICTION AND VENUE ...................................................... 2

III.    PARTIES            ...................................................................... 2

IV.     MEDICARE AND MEDICAID ..................................................... 5

V.      FALSE CLAIMS ACT .................................................................. 6

VI.     IMPORTANCE OF MEANINGFUL COMPLAINCE PROGRAMS ............... 7

VI.     ACCOUNTABLE CARE ORGANIZATION CERTIFICATIONS ................... 8
        A.  Accountable Care Organizations            .............. 8
        B.  CMS Requirements for ACOs                 ........... 8
               1.  Compliance Plans In Effect         ........... 8
               2.  Data Use Agreement                 ........... 9

C. Defendants' Certifications Of Compliance with
    CMS ACO Requirements.................................................  9
    1.  ACO Application  .................................................  10
    2.  ACO Participation Application.................................  11
    3.  CMS Payment of ACO Funds in Reliance
        On Certifications.................................................  12
VII. NON-COMPLIANCE OF DEFENDANTS WITH CMS REQUIREMENTS
        FOR PARTICIPATION IN ACO PROGRAMS............  13
    A. Defendants Did Not Have The Required
        Compliance Officer in Place              .........14
    1.  Failure To Have Compliance Officer          ..........15
    2.  Failure To Allow Compliance Officer To
        Report To PriMed ACO's Governing Body....................  15
    B. Defendants Failed to Comply With Requirements For
        Reporting and Addressing Compliance Problems...........  17
    1.  Failure To Have Hotline for reporting Non-Compliance........  17
    2.  Failure To Distribute A Compliance Program And To
        Address Non-Compliance Problems            .........17
    C. Defendants Failed To Comply With Training Requirements............  19
    D. Defendants Failed To Report Violations Of Law To Law
        Enforcement Agency....................................................  20
    E. Defendants Failed To Enter Into And Comply With A Data
        Use Agreement                           .......21
    F. Materiality Of Defendants' Non-Compliance With CMS
        Requirements...........................................................  22
IX. FALSE CLAIMS BASED ON NON-COMPLIANT MEDICAL RECORD
        DOCUMENTATION.................................................  22
    A. CMS's Condition of Payment for Physician Claims          ......  22
    B. PriMed CMS Claims With Ex Post Facto Altered Records..............  24
    C. PriMed CMS Claims With No Medical Records............................  26
    D. Audit Summaries Confirm Non-Compliance              .........  26
X. FAILURE TO RETURN PAYMENTS: REVERSE FALSE CLAIMS............  27
XI. CONSPIRACY TO DEFRAUD THE GOVERNMENT                      29
XII. DAMAGES AND FINES.................................................................  29
XIII. LEGAL CLAIMS FOR RELIEF .....................................................  30
    COUNT ONE:    False and/or Fraudulent Claims,
                  31 U.S.C. § 3729 (a)(1)(A).............................  30
    COUNT TWO: False Records and Statements,
                  31 U.S.C. § 3729 (a)(1)(B)              ......31
    COUNT THREE: Conspiracy to Defraud,
                  31 U.S.C. § 3729 (a)(1)(C)              ......33
    COUNT FOUR: False Statements to Conceal Obligations,
                  31 U.S.C. § 3729 (a)(1)(G)                  33
    COUNT FIVE:    Relator Howland Individual Retaliation,
                  Count 31 U.S.C. 3730(h)                    34

COUNT SIX:        False and/or Fraudulent Claims
                   C.G.S. 17b-301b(a)(1)                              ......35
COUNT SEVEN: False Records and Statements
                   C.G.S. 17b-301b(a)(2)                              ......36
COUNT EIGHT: Conspiracy to Defraud,
                   C.G.S. 17b-301b(a)(3)                              ......37
COUNT NINE: False Statements to Conceal Obligations,
                   C.G.S. 17b-301b(a)(8)                              ......37
XIV. PRAYERS FOR RELIEF............................................................. 38

*UNDER SEAL*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

**UNITED STATES OF AMERICA**
**and THE STATE OF CONNECTICUT,**
*ex rel* **KIMBERLY HOWLAND,**

**Plaintiff-Relator**

**vs.**                                                   **March 26, 2014**

**PRIMED, LLC, PRIMED LLC ACO,**
**MED3000, and MCKESSON,**

**Defendants.**                                **JURY TRIAL DEMANDED**

**<u>FALSE CLAIMS ACT COMPLAINT</u>**

## I.      <u>INTRODUCTION</u>

1.      This action is brought on behalf of the United States of America and the State of

Connecticut by Relator Kimberly Howland against the Defendants PriMed LLC, PriMed LLC,

ACO, Med3000, and McKesson pursuant to the Qui Tam provisions of the Federal Civil False

Claims Act, 31 U.S.0 §§ 3729 *et seq.* and the Connecticut False Claims Act, C.G.S. 17b-301 *et*

*seq* ("FCA"), alleging the Defendants violated the Federal and State FCAs by engaging in

unlawful activities in connection with their receiving payments from Medicare and Medicaid

from 2008 through the present.

2.      The false claims of the Defendants fall into two categories: falsely certifying to compliance with the Centers for Medicare and Medicaid Services (CMS) conditions for the receipt of millions of dollars in Medicare Shared Savings Program (MSSO) Accountable Care Organization (ACO) funds, and falsely certifying to compliance with CMS conditions for the submission of and receipt of payment for claims for physician medical services.

## II.    <u>JURISDICTION AND VENUE</u>

3.      This Court has jurisdiction over this action under the Federal FCA pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730, and has supplemental jurisdiction over the State of Connecticut FCA claims pursuant to 28 U.S.C. § 1367.

4.      Venue is appropriate as to the Defendants in that the Defendants transacted and transact business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by those Defendants in this judicial district. Therefore, venue is proper within the meaning of 28 U.S.C. § 1391(b) & (c), and 31 U.S.C. § 3732(a).

5.      Jurisdiction over this action is not barred by 31 U.S.C. § 3730(e) or C.G.S. 17b-301e(f): there is no civil suit or administrative proceeding involving the allegations and transactions herein to which the United States or the State of Connecticut is a party; there has been no "public disclosure" of these allegations or transactions; and, in any event, Relator is an "original source" of the information upon which these allegations are based.

## III.    <u>PARTIES</u>

6.      PriMed LLC is an integrated medical group that has over 115 providers with a minimum of 38 Connecticut locations in Fairfield and New Haven Counties. As of June 2012, the average total annual revenue for PriMed's participants and organizations was $41, 267,962. PriMed has at least 10,000 Medicare patients, and its physician specialties include: primary

care, internal and family medicine, cardiovascular medicine, ear, nose & throat, endocrinology & metabolism, gastroenterology, opthomology, general surgery, geriatrics, infectious disease, nutritional counseling, pediatrics, physical therapy, podiatric medicine & surgery, pulmonary & sleep medicine, rheumatology & arthritis, and urology. PriMed also has diagnostic and treatment centers, including: Connecticut Heart & Vascular Center, Fairfield County Endoscopy Center (which is an ambulatory surgical center), Fairfield County Sleep Center, Nutritional Counseling, Osteoporosis, and Physical Therapy centers.

7.      Based on an application dated March 26, 2012, PriMed LLC was selected on June 29, 2012, to participate in the Medicare Shared Savings Program as an Accountable Care Organization (ACO), a program sponsored by CMS. Exhibit 6. On July 17, 2012, CMS selected PriMed, LLC to participate in the Advanced Payment ACO Model, and assigned to PriMed, LLC an initial 8,500 Medicare beneficiaries. Exhibit 8. PriMed applied for $2,204,416 in ACO Advanced Payment funds and received approval for all three types of advanced payments. PriMed began receiving the Medicare ACO Advanced Payment funds in the last quarter of 2012, and as of June 30, 2014, PriMed will have received $2,204,416 in MMSP ACO payments. Exhibit 7 & 30.

8.      Founded in 1995, Med3000 is a national provider of health care management and technology services. Headquartered in Pittsburgh, it has 2,800 employees in 14 operating centers located in a dozen states across the United States, including Connecticut. Its clients include physicians, hospitals, health systems, health risk organizations, and EMS organizations.

9.      Since 1996, Med3000 has acted as agent for PriMed LLC and since 2012 for PriMed LLC, ACO. Med3000 was responsible for performing services such as: implementation and

maintenance of PriMed's Information Technology infrastructure; coding and billing for physician and health care services; internal auditing for compliance with Medicare billing regulations; managing Human Resources services, including the hiring and firing of employees, employee health benefits and payroll; revenue cycle management; implementation and maintenance of electronic health records; and acting as PriMed's managing agent for its ACO activities. Med3000's Vice President of Operations, Robert Chasin, was listed as the contact person for PriMed's ACO. Exhibit 2 at p.9 & Exhibit 33.

10.    McKesson is ranked 14th on the FORTUNE 500 with more than $123 billion in annual revenue. It is the largest health care services company in the nation, serving more than 50% of American hospitals, 20% of physicians, and 100% of health plans. McKesson's headquarters is located in San Francisco and it has over 37,000 employees.    In    January 2013, McKesson acquired Med3000. The Med3000 name continued but the organization became part of McKesson's Revenue Management Solutions. Exhibit 34. Hereafter, Med3000 will be referred to as Med3000/McKesson.

11.    Relator Kimberly Howland is a lifelong resident of Connecticut. She has been a Registered Nurse since 1990 and in 2012 received her Certification in Healthcare Compliance by the Health Care Compliance Association. She was employed as the Chief Compliance Officer for PriMed, LLC from February 4, 2013 through March 6, 2013. Although she also is an attorney and holds an LLM in taxation, as the Chief Compliance Officer at PriMed she was not serving as an attorney and did not provide any legal advice in that capacity (CMS regulations prohibit ACO Compliance Officers from also serving as legal counsel, 42 CFR 425.300(a)(1)).

12.       Relator Howland has independent, direct, unique, and personal first-hand knowledge of the unlawful practices of the Defendants, none of which is covered by any attorney-client privilege. To her knowledge, there are no civil or administrative proceedings involving the particular fraudulent allegations and transactions here revealed, nor has there been a "public disclosure" of the fraudulent transactions she here discloses.

### IV.   MEDICARE AND MEDICAID

13.       The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., (hereinafter "Medicare"), is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. The program is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS"). Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services and durable medical equipment to persons over sixty five (65) years of age and others that qualify under the terms and conditions of the Medicare Program.

14.       The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (hereafter "Medicaid"), is a Health Insurance Program administered by the Government of the United States and the various individual States and is funded by State and Federal taxpayer revenue. The Medicaid Program is overseen by the United States Department of Health and Human Services through CMS. Medicaid was designed to assist participating states in providing medical services to financially needy individuals that qualify for Medicaid.

### V.    FALSE CLAIMS ACT

15.     The Federal FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999. The Connecticut False Claims Act has a parallel provision. C . G. S . 17b-301b(a)(1).

16.     The Federal FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the Government a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999. The Connecticut False Claims Act has a parallel provision. C.G.S. 17b-301b(a)(2).

17.     The Federal FCA, 31 U.S.C. §3729(a)(1)(C), makes any person who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999. The Connecticut False Claims Act has a parallel provision. C.G.S. 17b-301b(a)(3).

18.     The Federal FCA, 31 U.S.C. § 3729(a)(1)(G), makes it illegal for any person to "knowingly" make, use or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and

$11,000 per claim for claims made on or after September 29, 1999. The Connecticut False Claims Act has a parallel provision. C.G.S. **17b-301b(a)(8).**

19.     The FCAs defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States or Connecticut Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. 31 U. S .C. 3729(b)(2), and C . G. S . 17b-301a(2).

## VI.      IMPORTANCE OF MEANINGFUL COMPLIANCE PROGRAMS

20.     The False Claims Acts make knowingly presenting or causing to be presented to the United States or the State of Connecticut any false or fraudulent claim for payment a violation of federal or state law. 31 U.S.C. § 3729(a), C.G.S. 17b-301b(a). The FCA applies to any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." The term knowingly "means a person has actual knowledge of the information or acts in deliberate ignorance of the truth or falsity of the information or acts in reckless disregard of the truth or falsity of the information," and "requires no proof of specific intent to defraud." 31 U.S.C. § 3729(b).

21.     Due to the overwhelming number and size of the grants and payments the federal government makes in furtherance of its multitude of programs, the federal government is simply unable to effectively police each recipient's compliance with all the conditions of such grants and payments. The purpose of the FCA's "deliberate ignorance" and "reckless disregard" provisions is to place squarely on each recipient of federal funds the requirement to have in place a meaningful compliance program that forces the recipient to police

itself. Such self-regulation can only be demonstrated by the presence of a robust internal program capable of documenting, verifying, and enforcing compliance with the conditions of the grant or payment. When a person certifies to compliance with the conditions of payment in the absence of a meaningful internal compliance program, that person is necessarily acting in "deliberate ignorance" or "reckless disregard" of the truth or falsity of that certification.

## VII.    ACCOUNTABLE CARE ORGANIZATION CERTIFICATIONS

### A.    Accountable Care Organizations

22.       As a result of the 2010 Affordable Care Act, the Centers for Medicare and Medicaid Services (CMS) began sponsoring Medicare Shared Savings Program (MSSP) Accountable Care Organizations. An Accountable Care Organization (ACO) is an organization of health care providers that agrees to be accountable for the quality, cost, and overall care of the Medicare beneficiaries assigned to it by CMS. ACOs are characterized by a payment and care delivery model that seeks to tie provider reimbursements to quality metrics and reductions in the total cost of care for the population of Medicare patients assigned by CMS.

23.       CMS has an Advanced Payment ACO Model designed to provide upfront funding for physicians who meet certain criteria to use for investments in their ACO infrastructure. There are three types of payments available: an upfront, fixed payment; an upfront variable payment based on the number of its historically-assigned beneficiaries; and a monthly payment based on the number of the participant's historically-assigned beneficiaries.

### B.    CMS Requirements For ACOs

#### 1.    Compliance Plan In Effect

24.       CMS regulations mandate that, in order to apply for ACO status or receive ACO funds, the entity must have in place a compliance plan that includes at minimum:

8

    (1) A designated compliance official or individual who is not legal counsel to the ACO and reports directly to the ACO's governing body;

    (2) Mechanisms for identifying and addressing compliance problems related to the ACO's operations and performance;

    (3) A method for employees or contractors of the ACO, ACO participants, ACO providers/suppliers, and other individuals or entities performing functions or services related to ACO activities to anonymously report suspected problems related to the ACO to the compliance officer;

    (4) Compliance training for the ACO, the ACO participants, and the ACO providers/suppliers;

    (5) A requirement for the ACO to report probable violations of law to an appropriate law enforcement agency.

42 CFR 425.300(a) (CMS's ACO regulations are attached as Exhibit 1). CMS mandates that, in order to be eligible to apply for ACO status, it is required that that such a compliance plan "will be put in place at the time the ACO's agreement with CMS becomes effective." 42 CFR 425.204(c)(vi). Thus, every entity that applies to CMS for ACO approval or that receives ACO payments from CMS must certify that such a compliance plan actually is in place as of the date the ACO Agreement becomes effective. 42 CFR 425.204(c)(vi) and 425.208(c). Such certification is a condition for receipt of ACO payments. And if any of the compliance plan elements listed above is not in place at the time the ACO Agreement becomes effective, it is fraudulent for an entity to receive ACO payments from CMS.

    2.  <u>Data Use Agreement</u>

25.    CMS also requires an ACO to enter into a Data Use Agreement (DUA) before participating in the program, 42 CFR 425.710(a)(1), and stresses that failure to comply with a DUA is grounds for termination from the program. 42 CFR 425.710(a)(2).

    **C.  <u>Defendants' Certifications Of Compliance With CMS ACO Requirements</u>**

26.    The CMS ACO regulations make it explicitly clear that it is *"a condition of participating* in the program *and receiving any shared savings payment,* that . . . the ACO will certify the

accuracy, completeness, and truthfulness of any data or information requested by or submitted to CMS, including, but not limited to, *the application form, participation agreement."* Exhibit 1: 42 CFR 425.208(c). And every year the ACO must recertify that it continues to be "in compliance with program requirements." 42 CFR 425.302(a)(3)(i).

    1.  <u>ACO Application</u>

27.    The CMS's ACO program application form specifically states: "By responding YES, you are attesting that you will be compliant as of the date of the agreement, unless the attestation or application requires an earlier compliance date." (Exhibit 2 at p. 3, ¶3). The Certification section of the application form specifically requires the applicant to notify CMS if any of the information is not true: "If I become aware that any information in this application is not true correct, or complete, I agree to notify CMS of this fact immediately and provide the correct and/or complete information." Exhibit 2 at p. 18.

28.    PriMed's ACO program Application is dated March 26, 2012. Exhibit 2 at p. 18. It was designated Application # A1154 and was electronically filed and deemed to be fully submitted to CMS as of March 28, 2012. Exhibit 5.

29.    In its ACO application, PriMed certified it did have a compliance plan that included at least all of the elements required by 42 CFR 245.300(a) as set forth above. (Exhibit 2 at p. 12).

30.    Prior to March 27, 2012, PriMed only had a skeletal "Corporate Compliance Plan" that did not comply with CMS ACO requirements. Exhibit 9 Compliance Plans 9/07 to 4/11. As part of its Application, PriMed attached a "Corporate Integrity and Compliance Program" dated March 27, 2012. (Exhibit 4 at p. 29). In that new document, PriMed stated it was "adopting a formal Compliance Program" that "shall be distributed in its entirety" to all

employees, each of whom will sign a written receipt for it. Exhibit 4 at p. 2. Also PriMed stated it "shall appoint a Compliance Officer" to, *inter alia,* train all PriMed parties on fraud and to report on fraud and compliance concerns "to PriMed's governing body, i.e., the PriMed Management Committee." Exhibit 4 at p.2-4. It is not sufficient merely for PriMed to put this Compliance Program down on paper; all the elements of the Compliance Program actually had to be "put in place at the time the ACO's agreement with CMS becomes effective." 42 CFR 425.204(c)(vi).

    2. <u>ACO Participation Agreement</u>

31.    Every entity approved for participation in CMS's ACO program is required to sign and submit to CMS a "Medicare Shared Savings Program Accountable Care Organization Participation Agreement." Exhibit 1: 42 CFR 425.208. By signing that Participation Agreement, the entity agrees to comply with all applicable laws, including the False Claims Act and the physician self-referral law, and certifies to the accuracy, completeness, and truthfulness of the statements in the ACO application and Agreement. *Id.*

32.    The MSSP Participation Agreement states: *"In order to* participate in the Shared Savings Program *and receive payment* . . .as an ACO, PriMed LLC agrees to comply with the provisions of . . .Title 42 CFR Part 425." Exhibit 6 at p.1. That Agreement also required PriMed to certify "the ACO agrees, *as a condition of participating* in the program *and receiving any shared savings payment,* that . . . the ACO will certify the accuracy, completeness, and truthfulness of any data or information requested by or submitted to CMS including but not limited to this Agreement, *the application form ..."* Exhibit 6 at p.2.

33.    On June 22, 2012, PriMed signed the mandatory CMS Participation Agreement, and thereby, "as a condition of participating in the program," certified to the accuracy and

truthfulness of its ACO Application as well as to its compliance with all the requirements of participation as an ACO. Exhibit 6. That included certification that all the elements of the Compliance Program PriMed submitted as part of its ACO Application actually had been "put in place at the time the ACO's agreement with CMS becomes effective." 42 CFR 425.204(c)(vi). In reliance on PriMed's certification that its Compliance Program had been put in place, CMS countersigned the agreement on June 29, 2012. *Id.*

### 3. CMS Payment Of ACO Funds In Reliance On Certifications

34.    PriMed also applied to CMS to receive Advanced Payment Model payments. On May 4, 2012, PriMed filed its "A1154 Advanced Payment Model Application," Exhibit 7, with a revised Application on June 28, 2012. Exhibit 7A. In reliance on PriMed's certifications in its ACO Application, Exhibit 2, and its Participation Agreement, Exhibit 6, on July 17, 2012, CMS signed an Advanced Payment ACO Model Innovation Agreement with PriMed. Exhibit 8 at p. 14. PriMed certified that it "meets all the eligibility requirements to participate in the Advanced Payment ACO Model." *Id.* at pgs.12 & 14. CMS confirmed that any failure by PriMed to comply with the MSSP regulations is grounds for termination. *Id.* at p. 8. Those regulations include the compliance program requirements set forth in 42 CFR Part 425.

35.    The term of the Advanced Payment Agreement is July 17, 2012, through December 31, 2015. Exhibit 8 at p.2. The Agreement states CMS will pay PriMed's ACO a total of $2,204,416,00, as follows: a one-time up front fixed payment of $250,000; a one-time up front variable payment of $308,592.00 (equal to the 8,572 Medicare beneficiaries CMS assigned to PriMed's ACO x $36); and monthly variable payments of $68,576.00 (equal to the 8,572 assigned Medicare beneficiaries x $8). Exhibit 8 at p.2-3.

36.     CMS began paying PriMed those ACO funds in the last quarter of 2012, and by the first

quarter of 2013 PriMed had received $512,752 in ACO funds. By the end of 2013, PriMed

had received $1,758,485 in ACO funds from CMS, and as of June 30, 2014, will have

received a total of $2,204,416 in ACO funds. Exhibit 8 & 30.

VII.   NON-COMPLIANCE OF DEFENDANTS WITH CMS REQUIREMENTS FOR
       PARTICIPATION IN ACO PROGRAM

37.     As noted above, it was a condition of receiving MSSP payments for PriMed to certify

its Compliance Program was in place no later than the date of the ACO Agreement. PriMed

falsely certified to CMS that its Compliance Program was in effect as of June 29, 2012, the

date the ACO Agreement became effective. In reliance on PriMed's false certifications of

compliance with CMS's conditions for receipt of MSSP payments, by June 2014 CMS will

have paid PriMed over $2.2 million in ACO funds.

38.     In February of 2013, eight months after the effective date of the ACA Agreement,

PriMed's ACO Executive Officer confirmed that its "Compliance Program Document was

put together for the ACO . . . to fulfill the requirements to participate in the MSSP." Exhibit

14. Since the date of the Application nothing had been done to put that Program into effect,

and the Chief Compliance Officer for Med3000 who had experience dealing with the PriMed

doctors candidly stated on February 27, 2013, that when it comes to compliance:

> there is no doubt this group of docs won't have a baseline
> appreciation for that. We have to begin to shift that culture -
> because if you never had CMS breathing down your back before
> ....... once you are an ACO with lots of upfront money, you can
> better believe they will be in your business (which is now their
> business)

Exhibit 25. Similarly, the Med3000 Implementation Specialist who dealt with PriMed, Shelley Macaluso, commented that when it comes to compliance training at PriMed, "It's hard when there are Drs and office managers that don't take this seriously." Exhibit 17.

39.     The evidence confirms the Compliance Program document PriMed submitted in its ACO Application was merely window-dressing designed to win ACO approval and funds, and that PriMed did nothing to actually put its Compliance Program into effect as of the date of its ACO Agreement or its receipt of millions in ACO funds.

### A. Defendants Did Not Have The Required Compliance Officer In Place

40.     CMS regulations require that, as of the date the ACO Agreement become effective, the ACO have in place "A designated compliance official or individual who is not legal counsel to the ACO and reports directly to the ACO's governing body." 42 CFR 425.300(a). CMS requires that such a compliance official must be "put in place at the time the ACO's agreement with CMS becomes effective." 42 CFR 425.204(c)(vi).

41.     In its ACO Application, PriMed certified it would be compliant with that requirement as of the date of the CMS ACO Agreement. Exhibit 2 at p.3 ("By responding YES, you are attesting that you will be compliant as of the date of the agreement") and p. 12 (responding YES to having a "designated compliance official"). Also, in its Corporate Compliance Program submitted as part of its ACO Application, PriMed stated "Primed shall appoint a Compliance Officer." Exhibit 4 at p.2.

42.     In reliance on PriMed's ACO Application dated March 28, 2012, CMS deemed its ACO Agreement with PriMed to be effective June 29, 2012. Exhibit 6. Similarly, CMS deemed PriMed's Advance Payment Agreement to be effective as of July 17, 2012. Exhibit 8.

1.   <u>Failure To Have Compliance Officer</u>

43.     PriMed/Mckesson did not have the required compliance officer in place as of the date of its ACO Application, the ACO Agreement, the Advanced Payment Agreement, or its receipt of ACO payments.

44.     PriMed's MSSP ACO application states: "PriMed intends to hire a Compliance Officer to implement PriMed's Compliance Plan and to protect the Shared Savings Program from fraud and abuse." Exhibit 2. And the "Corporate Compliance Program" PriMed submitted as part of its ACO Application flatly states: "PriMed shall appoint a Compliance Officer." Exhibit 4 at p.2.

45.     Despite attesting that it would be in full compliance with all ACO requirements by the date of its agreement with CMS, PriMed did not hire a Chief Compliance Officer until February 4, 2013. Exhibit 11 p.1 email. That was eight months after signing its agreement with CMS and several months after it had begun receiving ACO payments. Moreover, PriMed terminated its Chief Compliance Officer on March 6, 2013, and to Relator's knowledge has not advertised for or hired a replacement.

2.   <u>Failure To Allow Compliance Officer To Report To PriMed ACO's Governing Body</u>

46.     The governing body of PriMed's ACO is the PriMed Management Committee (PMC). Exhibit 33. CMS requires that the ACO's compliance officer "reports directly to the ACO's governing body," 42 CFR 425.300(a), which is the PriMed Management Committee. The Compliance Program PriMed submitted as part of its ACO Application stated the Compliance Officer would report "on a regular basis to PriMed's governing body" regarding implementing the Program. Exhibit 4 at p. 3.

47.     PriMed's CCO Job Posting promised that the CCO "will have direct access to" and "make a report of all compliance-related activities to" the "management committee at its meetings." Exhibit 12. But PriMed prohibited the Chief Compliance Officer from reporting to its governing body or even to the ACO Advisory Committee that recommends to its governing body.

48.     PriMed Medical Director Dr. Arnold DoRosario is a member of every influential committee and board of PriMed, often as the head or director, including the PMC governing body. (Exhibit 2 at p. A1154_OrgGov-BoardBene_032812). Since her hiring as CCO on February 4, 2013, Relator had noted the ACO lacked compliance policies, reporting mechanisms, and fraud training for its members. On February 26th she intended to present the governing body with a risk assessment report and suggestions for beginning to develop a compliance plan consistent with the Compliance Program set forth in PriMed's ACO application to CMS. However, that morning PriMed's Medical Director Dr. DoRosario told Relator she did not belong at that Meeting and was not to attend. When Relator pointed out that the Management Committee is the governing board of PriMed and thus the Board she is required to report to as CCO, Dr. DoRosario adamantly refused to allow her to be at the Meeting.

49.     On February 28, 2012, Relator again was prevented from reporting compliance issues. The function of PriMed's ACO Advisory Committee is to make recommendations to PriMed's Management Committee (PriMed's governing body) regarding the ACO. Exhibit 2 at p. "OrgGov-Committees". During the February 28th meeting of the ACO Advisory Committee, Relator began to report on her initial risk and compliance concerns, but was cut off in mid-sentence by Dr. DoRosario and prevented from continuing.

**B. Defendants Failed To Comply With Requirements For Reporting and Addressing Compliance Problems**

50.     CMS requires ACOs to have mechanisms in place for identifying and addressing compliance problems and for anonymously reporting compliance problems to the Compliance Officer. 42 CFR 425.300(a)(2) & (3).

    1.  Failure To Have Hotline For Reporting Non-Compliance

51.     PriMed did not have an anonymous reporting mechanism in place as required by CMS. In its Employee Handbook dated Janaury 2009, PriMed listed a hotline number in its employee Handbook to be used for anonymous reporting of suspected fraud: 888-811-2411 ext 550. Exhibit 10 at p.35. However, when Relator called that number on February 25th, she received a recorded message stating "that is not a valid extension" with no further instructions how to call a valid number. And despite stating in its ACO Application Compliance Program that it would create a "suggestion box" for employees to "submit confidential statements outlining" fraud and non-compliance instances, PriMed did not put in place any such mechanism.

    2.  Failure To Distribute A Compliance Program And To Address Non-Compliance Problems

52.     PriMed certified that the Compliance Program it submitted to CMS in order to qualify for ACO payments "shall be distributed in its entirety" to "PriMed's directors, managers, and each and every employee of the PriMed Parties, including without limitation, those employees involved in billing or collection of health care supplies and/or healthcare services, and any other contractors or agents of the PriMed involved, directly or indirectly, in the provision for health care supplies and/or healthcare services to any government or private third party payor." (Exhibit 4 at p.2).

53.     Also, the Compliance Program certified that all of those individuals "shall acknowledge his or her receipt and review of the Compliance Program by executing the Acknowledgement form. A copy of the Acknowledgement of receipt and review form shall be kept in the Compliance Plan Binder." Exhibit 4 at p.2.

54.     As for the Compliance Binder, the Compliance Program certified that: "All records necessary to protect the integrity of PriMed's compliance process and to confirm the effectiveness of the Compliance Program shall be maintained on-site in a Compliance Binder." Exhibit 4 at p. 16. The Compliance Binder "shall include" records such as documents confirming adequate training, results of auditing, and Acknowledgement forms.

55.     Despite certifying to CMS that all these elements would be in place by the date of the ACO Agreement (i.e., June 29, 2012), PriMed failed to distribute its Compliance Program and failed to maintain a Compliance Binder with the required documents.

56.     After being hired as Chief Compliance Officer in early February 2013, Relator was not provided with a copy of PriMed's Compliance Program. After repeatedly asking for a copy over a period of two weeks, Relator was informed by Med3000 Christine Hines and Tara Miller that there was no compliance plan or program to give her.

57.     Relator only discovered the covert existence of a plan after she happened to mention to Rob Chasin that she was drafting a compliance plan herself, and Chasin stated one already existed. When Mr. ChasM e-mailed a copy to Relator on February 14th, he also sent copies to Christine Hines and his secretary, Debbie Hardwicke, who had no prior knowledge of its existence. Mr. ChasM apparently was the only person who knew of the plan's location and was not offering it to employees or requiring them to read it and sign a receipt for it.

58.     PriMed certified to CMS that Rob ChasM is the "ACO Executive," "CMS Liaison," and "ACO Application Contact." Exhibit 2 at p.9. Chasin's February 14th email to Relator confirms that PriMed created the Compliance Program on paper with no intention of actually putting it in place as of June 29, 2012, or even after receiving ACO funding from CMS: "The Compliance Program Document was put together for the ACO . . . It was meant as a starting point and to fulfill the requirements to participate in the MSSP." Exhibit 14. This confirms PriMed only put the Program on paper in order to obtain the ACO payments, and falsely certified to CMS that the Program "will be put in place at the time the ACO' s agreement with CMS becomes effective." 42 CFR 425.204(c)(vi). None of the elements of the Program were put in place as of the ACO Agreement date of June 29, 2012, or when PriMed started receiving ACO payments.

### C.  Defendants Failed To Comply With Training Requirements

59.     CMS mandates that ACOs must have "compliance training for the ACO, the ACO participants, and the ACO providers/suppliers" in place as of the effective date of the ACO Agreement. 42 CFR 425.300(a)(4). In order to obtain ACO funds from CMS, PriMed certified in its ACO Application that it would have an elaborate training program in place. Exhibit 4 at pgs. 6-9. PriMed's paper Program included annual training on "fraud and abuse statutes and regulations" and "Medicare Fraud and Abuse Training" with certificates of completion signed by each individual. *Id.*

60.     PriMed did not have fraud or waste and abuse training in place as of the date the ACO Agreement became effective or after it began to receive ACO funds from CMS. This is in direct violation of CMS's ACO regulations and PriMed's certification to CMS.

61.     During her interview process in January 2013, Relator was told by Tara Miller (Med3000's Director of Human Resources), Hilary Harlan (Med3000's Chief Compliance and Ethics Officer), and Amy Andersen that PriMed had no fraud training programs or records and that she would have to start from nothing. After being hired as CCO, Relator asked Med3000 employee Christine Hines if there were any training programs in place to build on, and was told there were none. There was no Compliance Binder with training records, and Relator was never provided with any records of fraud training for any employee or ACO member.

### D. Defendants Failed To Report Violations Of Law To Law Enforcement Agency

62.     PriMed did not comply with CMS requirements or its own Compliance Program requirement regarding the reporting of probable violations of law. CMS requires ACOs "to report probable violations of law to an appropriate law enforcement agency." 42 CFR 425.300(a)5).

63.     PriMed's ACO Compliance Program stated: "In no case will PriMed endeavor to conceal PriMed or individual wrongdoing." Exhibit 4 at p.4. It went on to state that if any "management official discovers credible evidence of misconduct from any source and, after a reasonable inquiry, has reason to believe that the misconduct may violate criminal, civil, or administrative law, then PriMed must promptly report the existence of misconduct to the appropriate federal and state authorities within a reasonable period, but not more than sixty (60) days after determining that there is credible evidence of a violation." Exhibit 4 at p. 14.

64.     After being hired as CCO in February of 2013, Relator was informed by Med3000 officer Tara Miller that a violation of law regarding controlled substance prescriptions occurred in November or December of 2012 at the PriMed office of Dr. Dafcik. Relator was

asked by Ms. Miller to look into the compliance issues for this matter as there were no policies in place for prescription writing. Exhibit 15.

65.      Relator informed Ms. Miller that CMS regulations require reporting of the incident to law enforcement within 60 days. Exhibit 16. On February 26, 2013, Relator also informed PriMed Medical Director Dr. DoRosario and President Dr. Rastogi that the incident needed to be reported to the local law enforcement agency. Exhibit 24.

66.      A phone call made to the local police by Relator confirmed the incident was not reported to the law enforcement agency within 60 days, in violation of CMS regulations and PriMed's own Compliance Program.

## E.  Defendants Failed To Enter Into And Comply With A Data Use Agreement

67.      CMS requires an ACO to enter into a Data Use Agreement (DUA) before participating in the program, 42 CFR 425.710(a)(1), and stresses that failure to comply with a DUA is grounds for termination from the program. 42 CFR 425.710(a)(2).

68.      PriMed apparently did not execute a Data Use Agreement upon acceptance to the MSSP ACO program as required by CMS, or put a DUA into effect.

69.      Rob Chasin, Chief Operating Officer for PriMed's ACO, is listed in PriMed's ACO Application as the "ACO Executive," "CMS Liaison," and "Application Contact" for PriMed's ACO. Exhibit 2 at p. 9 & Exhibit 33. Mr. Chasin at all times was intimately involved in the Application process and management of PriMed's ACO. He personally held all the ACO materials at his desk.

70.      CMS requires all accepted ACO participants who state in their application that they will be requesting HIPAA protected patient information to sign a Data Use Agreement upon approval. (Exhibit 2 at p. 16). As of February 2013, when Relator requested a copy of the

Data Use Agreement from Chasin, he responded with an email confirming he had no knowledge or understanding of a Data Use Agreement: "What's a DUA agreement?" Exhibit 27.

### F. Materiality Of Defendants' Non-Compliance With CMS Requirements

71.     When CMS mandates that all the elements of PriMed's Compliance Program "must be in place at the time the ACO agreement with CMS becomes effective," 42 CFR 425.204(c)(vi), it does not mean just a paper document with no relation to reality must in place. It means all the elements of PriMed's Compliance Program must be in place and actually operating as intended. It is fraudulent for an ACO applicant to obtain ACO approval and then to receive ACO payments conditioned on a Compliance Program that is merely window-dressing and never put into effect.

72.     Defendants' falsely certified to compliance with all the CMS conditions for approval as a ACO and for receipt of ACO funds, and in reliance on those false certifications CMS granted the defendants ACO status and paid ACO funds to them. CMS would not have approved the defendants' ACO and made such ACO payments if PriMed's non-compliance with CMS's conditions for receipt of MSSP funds had been properly disclosed.

## IX.   FALSE CLAIMS BASED ON NON-COMPLIANT MEDICAL RECORD DOCUMENTATION

### A.   CMS's Condition Of Payment For Physician Claims

73.     CMS requires that all medical records on which Medicare billing is based be complete and legible with no deletions. It further requires that any amendments, corrections, or addenda clearly be identified as such. Medical records that do not comply with these requirements cannot be used as the basis for a Medicare claim and providers who violate these requirements are not entitled to payment from CMS.

74.     Section 4.2.1 of the CMS  Medicare Program Integrity Manual ("Manual") gives

examples of Medicare fraud, and specifically names altering medical documentation:

> The most frequent kind of fraud arises from a false statement or
> misrepresentation made, or caused to be made, that is material to
> entitlement or payment under the Medicare program. . . .
> Fraud may take such forms as: . . . Altering claim forms, electronic claim
> records, medical documentation, etc. to obtain a higher payment amount.

Manual at Section 4.2.1.

75.     The Manual  at Section 3.3.2.5 controls amendments, corrections, and delayed entries in

medical documentation. The  Manual confirms that any claims based on non-compliant

medical record entries must be excluded from consideration and denied:

> Regardless of whether a documentation submission originates from a paper
> record or an electronic health record, documents submitted to MACs,
> CERT, Recovery Auditors, and ZPICs containing amendments, corrections
> or addenda must:
>
> 1. Clearly and permanently identify any amendment, correction or delayed
>    entry as such, and
> 2. Clearly indicate the date and author of any amendment, correction or
>    delayed entry, and
> 3. Not delete but instead clearly identify all original content.

Manual at Section 3.3.2.5.B. The submission of any Medicare claim based on absent, illegible,

or improperly altered medical documentation is a false claim.

76.     From at least 2009 through the present, PriMed, LLC and Med3000/McKesson

submitted false Medicare and Medicaid claims that did not have proper medical

documentation or any documentation at all. PriMed and Med3000/McKesson systematically

submitted claims with no documentation or non-compliant documentation, and then

fraudulently dictated, re-wrote, created, altered, or amended the documentation on which

those submitted claims were based.

23

### B. PriMed CMS Claims With Ex Post Facto Altered Records

77.     The following examples from Med3000's internal audit records of PriMed's coding and billing submissions for the year 2009 through 2012 confirm that Med3000, in violation of CMS's conditions of payment, improperly instructed PriMed physicians to create, alter, or re-write medical records for claims that were previously submitted and paid. See Exhibit 11.

78.     For PriMed office 25, (PM25), located at 888 White Plains Road Suite 110 Trumbull, CT, the report identified the most problematic of those that did not comply: one physician was reported to have 0% accuracy, three physicians had accuracy in the 20%-26% range, two in the 40%-45% range and five in the 50%-55% range. Med3000/McKesson recommended that for two of the physicians, the documentation records be "re-written or dictated" for "illegible or missing documentation" and to "check content." The patient medical records that were recommended to be re-written or dictated include medical record numbers p027493, p043641, p119906, p124386, p125050, p215749, for Dr. Levine; and p009612, p103628 for Dr. Latzman. These records were for a 10/11/2010 and 10/14/2010 date of service ("DOS"). The audit shows that these re-written or dictated records were received by Med3000 on 4/15/2011 and 5/10/2011.

79.     For PM18, located at 2900 Main St Suite 3A: Stratford, CT, the report shows that Med3000/McKesson "sent a list of patients . . . that need to be rewritten or dictated and returned" to Dr. Toumanian's office. These include seven patients' charts with medical record numbers: p005802, p213758, p068349, p101411, p 216457, p184826, p144141. The summary report shows that these re-written or re-dictated patient charts were received by Med3000 on 4/25/2011.

80.     For PM17, located at 2150 Black Rock Turnpike Suite 201 Fairfield, CT, the report shows that Med3000/McKesson requested Dr. Herbin to "re-write or dictate all ten records" audited because all were illegible. It also shows that Dr. Herbin complied with this request and Med3000/McKesson received the re-written notes on 5/3/2011.

81.     For PM16, located at 999 Silver Lane, Suite 3A Trumbull, CT, the report shows that 31 patient medical records were recommended to be re-written or dictated for illegibility and/or content. These are identified by record numbers p019403, p104765, p104897, p125531, by Dr. Alcedo; p044880, p904123, p125424, p046364, p041304, p123438, p042127, p076500, p041649, by Dr. Bertini; p065364, p067337, p198680, p111534, p039622, p186650, p114680, p204153, by Dr. Logiadis; p103750, p065669, p005181, p201745, p135606, by Dr. Miller; p166285, p055377, p19'7588, p141007, p022768 by Dr. Uricoli. All of these records were for a 10/11/2010 DOS. The re-written or dictated records were received by Med3000/McKesson on 4/12/2011, 5/3/2011 and 5/16/2011.

82.     For PM11, located at 3715 Main Street, Suite 200, Bridgeport, CT, the 2009 PriMed coding audit summary shows that Dr. Gada was requested by Med3000/McKesson to re-write records due to illegibility and that these re-written records were received by Med3000/McKesson on 4/12/2011. These re-written records were also noted to be 10% accurate, with eight records illegible and needed to be re-written again "for content".

83.     The audit for Dr. Mikan of PM04, located at 4 Corporate Drive, Suite 394, Shelton, CT, showed 20% accuracy for coding and that the DOS for one record did not match the remainder of the record.

84.     Med3000/McKesson requested re-written patient notes on six patient records due to illegibility from Dr. Watkins-Colwell of PM02, located at 325 Reef Rd Suite 203: Fairfield,

CT. The patient medical record numbers for the documentation requested to be re-written are p21064, p090037, p216455, p150669, p107540, p062021. The re-written records were received by Med3000 on 4/12/2011.

85.     Med3000/McKesson "requested the following records to be either re-written or dictated for legibility" from Dr. Das of PM01, located at 501 Kings Hwy E Suite 106, Fairfield, CT: p077228, p055429, p033337, p008990. The audit record shows that these re-written records were received on 5/6/2011. In addition, the audit record shows that one record "has a different service date on billing than in the notes sent."

### C.   PriMed CMS Claims With No Medical Records

86.     On or about February 8, 2013, Dr. DoRosario informed Relator that PriMed physician Dr. DeStefano of PriMed office 13 (PM13), located at 3180 Main Street, Suite 301, Bridgeport, CT, had not documented or dictated patient care notes for services rendered to 600 patients. Long after those claims had been billed and paid, Dr. DoRosario ordered Dr. DeStefano to create medical records to justify those claims. Tara Miller, a Med3000 employee who holds the title of Director of Human Resources for PriMed, LLC and PriMed, LLC ACO, also informed Relator of the same.

### D.   Audit Summaries Confirm Non-Compliance

87.     In addition to the fraudulent alteration or creation of medical records, Med3000/McKesson's internal audits confirmed systemic non-compliance with billing and coding requirements.

88.     Med3000/McKesson's 2010 Coding Audit Summary of PriMed, LLC revealed diagnosis accuracy was primarily 80% and the E/M accuracy ranged from 40% to 80%.

89.     Med3000/McKesson's 2011 Coding Audit Summary of PriMed, LLC at Exhibit 11

revealed:

   a) Accuracy rates for diagnosis ranged from 0% to 89%.
   b) Accuracy rates for Evaluation and Management documentation ranged from 30% to
      70%.
   c) Med3000/McKesson's action plan included requests for "notes to be re-written" for
      Dr. Herbin of PM17.

90.     The defendants did not notify CMS regarding the false claims revealed by these audits,

and did not repay those false claim payments to CMS.

## X.   FAILURE TO RETURN PAYMENTS: REVERSE FALSE CLAIMS

91.     The False Claims Act provides that any person who knowingly conceals or knowingly

and improperly avoids or decreases an obligation to pay or transmit money or property to the

Government is liable for civil penalties and treble damages for each violation. 42 USC

3729(a). An "obligation" is "an established duty, whether or not fixed, arising from an

express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-

based or similar relationship, from statute or regulation, or from the retention of any

overpayment". 42 USC 3729(b)(3).

92.     Section 6402 of the Affordable Care Act (ACA) amends Part A of title XI of the Social

Security Act, Medicare and Medicaid Program Integrity provisions, as well as the civil

monetary penalties of the Social Security Act, 42 U.S.C. 1320a-7k(d), to include provisions

for the return of overpayments. The amendments define the term 'overpayment' as "any

funds that a person receives or retains under title XVIII [Medicare] or XIX [Medicaid] to

which the person, after applicable reconciliation, is not entitled under such title." The

amendments further provide that any overpayment retained by a person after the deadline for

reporting and returning an overpayment is an obligation as defined in the federal False

Claims Act, 31 U.S.C. § 3729(b)(3), and must be returned. Any overpayment must be returned within 60 days after it is identified and must contain a written explanation for the return. ACA, *supra,* §6402.

93.     When submitting the application for participation in the MSSP ACO program, PriMed, LLC, Amit Rastogi, MD, Arnold DoRosario, MD, Med3000/McKesson, and Rob Chasin knew that PriMed, LLC did not have in place all the elements required by CMS for eligibility to participate. Those elements also were required to be in effect as of the date of the agreement with CMS and when receiving ACO funds. The defendants falsely certified to CMS that all the mandatory elements were in place as of the effective date of the Agreement and the receipt of ACO funds. CMS would not have approved ACO status or funding for the defendants if it had known of those false certifications of compliance with CMS conditions for the receipt of MSSP ACO payments. Accordingly, the defendants' ACO status was obtained as the result of a knowing fraud, and they were obligated to repay all the ACO funds they received.

94.     The PriMed audit records for the years 2009 through 2012 confirm that significant percentages of medical records generated by physicians were non-compliant with CMS requirements for payment. Those records also confirm that the defendants directed those physicians to alter, re-write, re-dictate, or create out of nothing medical records, all in violation of CMS conditions for receipt of service payments. Rather than returning the payment for those services with the required explanation, the defendants kept the payments and altered the records *ex post facto* in order to protect against any future CMS audit.

XI.   CONSPIRACY TO DEFRAUD THE GOVERNMENT

95.      Section 3729(a)(1)(C) provides that any person who conspires to commit a violation of
         subparagraphs (A), (B), (D), (E), (F) or (G) is liable to the United States Government. A
         claim is any request or demand of money from the Government that is made directly or
         through an intermediary. 31 U.S.C. 3729(c).

96.      Through their deliberate and willful acts, PriMed,LLC, Med3000/McKesson, Dr.
         Arnold DoRosario, Rob Chasin, and Dr. Amit Rastogi agreed to knowingly submit
         fraudulent, misleading, and false documentation to the government in order to secure
         approval to participate in the MSSP ACO program and to receive MSSP payments in the
         amount of $2, 204,416.

97.      Through their deliberate and willful acts, PriMed,LLC and Med3000/McKesson agreed
         to knowingly submit fraudulent, misleading, and false claims to CMS based on non-
         compliant medical record documentation, and agreed to knowingly avoid an obligation to
         pay back CMS for the false claims paid by CMS on the basis of non-compliant medical
         record documentation.

XII.   DAMAGES AND FINES

98.      The practices by Defendants described above have caused the submission of false and
         fraudulent claims to the Medicare and Medicaid Programs and the receipt of payments based
         on those false and fraudulent statements. Accordingly, the Medicare and Medicaid Programs
         have been damaged significantly because of Defendants' illegal and fraudulent activities.

99.      The defendants obtained ACO status and funding based on their false certification of
         compliance with CMS's conditions for receipt of MSSP ACO payments. As of June 30,
         2014, the defendants will have received $2,204,416 in ACO payments. Under the False

Claims Act, the amount of damages to the government is trebled, with mandatory fines up to $11,000 for each payment received from CMS.

100.      CMS requires that all medical records on which Medicare billing is based be complete and legible with no deletions. It further requires that any amendments, corrections, or addenda clearly be identified as such. Medical records that do not comply with these requirements cannot be used as the basis for a Medicare claim and providers who violate these requirements are not entitled to payment from CMS. Any CMS payments based on non-compliant medical records must be reported and refunded to CMS within 60 days.

101.      A significant percentage of the defendants' medical records failed to comply with CMS medical documentation requirements. Despite being on notice of this through internal audits, the defendants failed to refund those overpayments to CMS. Each one of those reverse false claims mandates treble damages plus a mandatory fine of up to $11,000.

### XIII.   LEGAL CLAIMS FOR RELIEF

102.      Relators allege that the conduct of the Defendants detailed above violates the False Claims Act ("FCA") of the United States, 31 U.S.C. §§ 3729-3733, as amended (Counts One through Five), and the False Claims Acts of the State of Connecticut, C.G.S. 17b-301 et seq (Counts Six through Nine). Relators bring these claims on behalf of the federal and state governments as well as on their own behalf

**COUNT ONE:**      **False and/or Fraudulent Claims, 31 U.S.C. § 3729 (a)(1)(A)**

103.      Relators restate and reallege the allegations in paragraphs 1 through 101 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

104.     This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

105.     Through the above-described acts and omissions, and from at least on or before 2008 to the present, the Defendants knowingly caused to be presented for payment and approval false and/or fraudulent claims to officers of the United States Government. As a result of this illegal activity, these claims were improper in whole pursuant to 31 U.S.C. § 3729(a)(1)(A).

106.     Medicare and Medicaid program officials, their contractors, carriers, intermediaries and agents, paid and approved claims for payment that should not have been paid or approved.

107.     The Defendants, through the means described above, deliberately and intentionally concealed the false and fraudulent nature of the claims from Medicare and Medicaid program officials, their contractors, carriers, intermediaries and agents, in order to induce payment of the false and fraudulent claims.

108.     Had they known the truth, Medicare and Medicaid program officials and their contractors, carriers, intermediaries and agents, would not have paid the claims for services or would not have paid the MSSP ACO funds received by the Defendants.

109.     By reason of the above-described presentment of false and fraudulent claims, the United States has suffered significant losses in an amount to be determined.

**COUNT TWO:       False Records and Statements, 31 U.S.C. § 3729 (a)(1)(B)**

110.     Relators restate and reallege the allegations in paragraphs 1 through 101 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

111.     This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

112.     Through the above-described acts and omissions, and from on or before at least 2008 to the present, the Defendants knowingly made and used, and caused to be made and used, false records and statements for the purpose of having false and fraudulent claims paid and approved by Medicare and Medicaid program officials, their contractors, carriers, intermediaries and agents. As a result of this illegal activity, these claims were improper in whole pursuant to 31 U.S.C. § 3729(a)(1)(B).

113.     Medicare and Medicaid program officials, their contractors, carriers, intermediaries and agents, paid and approved claims for payment that should not have been paid or approved.

114.     The Defendants, through the means described above, deliberately and intentionally concealed the false and fraudulent nature of the claims from Medicare and Medicaid program officials, their contractors, carriers, intermediaries and agents, in order to induce payment of the false and fraudulent claims.

115.     Had they known the truth, Medicare and Medicaid program officials and their contractors, carriers, intermediaries and agents, would not have paid the claims for services or would not have paid the MSSP ACO funds received by the Defendants.

116.     By reason of the above-described presentment of false records and statements, the United States has suffered significant losses in an amount to be determined.

**COUNT THREE:     Conspiracy to Defraud, 31 U.S.C. § 3729 (a)(1)(C)**

117.        Relators restate and reallege the allegations in paragraphs 1 through 101 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

118.        This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

119.        Through the above-described acts and omissions, and from on or before at least 2008 to the present, the Defendants conspired to defraud the federal government by having false and fraudulent claims paid and approved by Medicare and Medicaid program officials, their contractors, carriers, intermediaries and agents. As a result of this illegal activity, these claims were improper in whole pursuant to 31 U.S.C. § 3729(a)(1).

120.        By reason of the above-described unlawful conspiracy, the United States has suffered significant losses in an amount to be determined.

**COUNT FOUR:     False Statements to Conceal Obligations, 31 U.S.C. § 3729(a)(1)(G)**

121.        Relators restate and reallege the allegations in paragraphs 1 through 101 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

122.        This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

123.        Through the above-described acts and omissions, the Defendants knowingly made and used, and/or caused to be made and used, false records and statements in order to conceal, avoid and/or decrease the Defendants' obligations to pay or transmit monies to Medicare and Medicaid programs, in violation of 31 U.S.C. 3729(a)(1)(G).

124.     By reason of the above-described false records and statements, the United States has suffered significant losses in an amount to be determined.

**COUNT FIVE:**          **Relator Howland Individual Retaliation Count 31 U.S.C. 3730(h)**

125.     Relator Kimberly Howland re-alleges and incorporates by reference each and every allegation contained in the paragraphs 1-101 above as through fully set forth herein.

126.     During her brief tenure as Chief Compliance Officer for PriMed's ACO, Howland pointed out numerous deficiencies in the Defendants' compliance with CMS's ACO regulations and conditions for receiving payment for MSSP ACO funds.

127.     Howland pointed out to the Defendants that this was a fraudulent practice that did not comply with federal regulations applicable to Medicare and Medicaid, and she repeatedly requested that the Defendants take action to be in compliance with CMS's regulations and conditions for receipt of MSSP ACO payments.

128.     The Defendants' supervisors and corporate officials were aware of her insistence that they fully comply with CMS's regulations and conditions of payment for MSSP ACO funds.

129.     As a result of her actions and comments insisting the Defendants stop and remedy its fraudulent ACO conduct, she was abruptly terminated on March 6, 2013. That termination was in violation of 31 U.S.C. 3730(h).

130.     As a direct and proximate result of her unlawful termination, Howland has suffered emotional pain and mental anguish, together with economic hardship including lost salary and income, and special damages.

**COUNT SIX:**          **False and/or Fraudulent Claims, C.G.S. 17b-301b(a)(1)**

131.        Relators restate and reallege the allegations in paragraphs 1 through 101 above as if
each were stated herein in their entirety and said allegations are incorporated herein by
reference.

132.        This is a claim for treble damages and monetary penalties pursuant to the
Connecticut False Claims Act, C.G.S. 17b-301 et seq.

133.        Through the above-described acts and omissions, and from at least on or before
2008 to the present, the Defendants knowingly caused to be presented for payment and
approval false and/or fraudulent claims under a medical assistance program administered by
the Connecticut Department of Social Services, including the Medicaid program. As a result
of this illegal activity, these claims were improper pursuant to C.G.S. 17b-301b(a)(1).

134.        Connecticut Department of Social Services officials, their contractors, carriers,
intermediaries and agents, paid and approved claims for payment for such services that
should not have been paid or approved.

135.        The Defendants, through the means described above, deliberately and intentionally
concealed the false and fraudulent nature of the claims from Connecticut Department of
Social Services officials, their contractors, carriers, intermediaries and agents in order to
induce payment of the false and fraudulent claims.

136.        Connecticut Department of Social Services officials, their contractors, carriers,
intermediaries and agents would not have paid the claims for services or otherwise
reimbursed or advanced monies to the Defendants had they known the truth.

137.        By reason of the above-described presentment of false and fraudulent claims, the
State of Connecticut has suffered significant losses in an amount to be determined.

**COUNT SEVEN:     False Records and Statements, C.G.S. 17b-301b(a)(2)**

138.        Relators restate and reallege the allegations in paragraphs 1 through 101 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

139.        This is a claim for treble damages and monetary penalties pursuant to the Connecticut False Claims Act, C.G.S. 17b-301 et seq.

140.        Through the above-described acts and omissions, and from on or before at least 2008 to the present, the Defendants knowingly made and used, and caused to be made and used, false records and statements for the purpose of having false and fraudulent claims paid and approved by a medical assistance program administered by the Connecticut Department of Social Services, including the Medicaid program. As a result of this illegal activity, these claims were improper in whole pursuant to C.G.S. 17b-301b(a)(2).

141.        Connecticut Department of Social Services officials, their contractors, carriers, intermediaries and agents, paid and approved claims for payment for such services that should not have been paid or approved.

142.        The Defendants, through the means described above, deliberately and intentionally concealed the false and fraudulent nature of the claims from Connecticut Department of Social Services officials, their contractors, carriers, intermediaries and agents in order to induce payment of the false and fraudulent claims.

143.        Connecticut Department of Social Services officials, their contractors, carriers, intermediaries and agents would not have paid the claims for services or otherwise reimbursed or advanced monies to the Defendants had they known the truth.

144.     By reason of the above-described presentment of false records and statements, the State of Connecticut has suffered significant losses in an amount to be determined.

**COUNT EIGHT:     Conspiracy to Defraud, C.G.S. 17b-301b(a)(3)**

145.     Relators restate and reallege the allegations in paragraphs 1 through 101 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

146.     This is a claim for treble damages and monetary penalties pursuant to the Connecticut False Claims Act, C.G.S. 17b-301 et seq.

147.     Through the above-described acts and omissions, and from on or before at least 2008 to the present, the Defendants conspired to defraud the government of the State of Connecticut by having false and fraudulent claims paid and approved by a medical assistance program administered by the Connecticut Department of Social Services, including the Medicaid program. As a result of this illegal activity, these claims were improper in whole pursuant to C.G.S. 17b-301b(a).

148.     By reason of the above-described unlawful conspiracy, the State of Connecticut has suffered significant losses in an amount to be determined.

**COUNT NINE:     False Statements to Conceal Obligations, C.G.S. 17b-301b(a)(8)**

149.     Relators restate and reallege the allegations in paragraphs 1 through 101 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

150.     This is a claim for treble damages and monetary penalties pursuant to the Connecticut False Claims Act, C.G.S. 17b-301 et seq.

151.     Through the above-described acts and omissions, the Defendants knowingly made and used, and/or caused to be made and used, false records and statements in order to conceal, avoid

and/or decrease the Defendants' obligations to pay or transmit monies to a medical assistance program administered by the Connecticut Department of Social Services, including the Medicaid program, in violation of C.G.S. 17b-301b(a)(8).

152.      By reason of the above-described false records and statements, the State of Connecticut has suffered significant losses in an amount to be determined

## XIV.   **PRAYERS FOR RELIEF**

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America and the State of Connecticut, and on her own behalf, demands and prays that judgment be entered against the Defendants as follows:

(a)      In favor of the United States against the Defendants jointly and severally for treble the amount of damages to the Medicare and Medicaid Health Care Programs from the illegal activities alleged herein, plus maximum civil penalties of $11,000.00 for each false claim;

(b)      In favor of the United States against the Defendants jointly and severally for disgorgement of payments received by Defendants as a result of their illegal schemes under the federal FCA;

(c)      In favor of the State of Connecticut against the Defendants jointly and severally for treble the amount of damages to a medical assistance program administered by the Connecticut Department of Social Services, including the Medicaid program, plus maximum civil penalties of $11,000.00 for each false claim;

(d)      In favor of the State of Connecticut against the Defendants jointly and severally for disgorgement of payments received by Defendants as a result of their illegal schemes under the Connecticut FCA;

(e)      In favor of the Relator for the maximum amount allowed pursuant to the federal FCA and the Connecticut FCA, including reasonable expenses, attorney fees, and costs incurred by Relator;

(f)      For all costs of this FCA civil action;

(g)      In favor of the Relator, the United States, and the State of Connecticut for such other and further relief as this Court deems to be just and equitable;

*PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS*

RESPECTFULLY SUBMITTED,

By: _____

    Charles C. Goetsch, Esq.  *(CG9082)*
    CHARLES GOETSCH LAW OFFICES LLC
    405 Orange Street
    New Haven, CT 06511
    Tel.: (203) 672-1370
    Fax: (203) 776-3965
    E-mail: charlie@gowhistleblower.com